UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**FILED**
AUG - 6 2007
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL., ) | |
| DREW TERRELL, pro se, ) | |
| Petitioner, ) | |
| ) | |
| -vs- ) | Case No. 07-1208 |
| ) | |
| EDDIE JONES, Warden of Pontiac ) | |
| Correctional Center, ) | Case Number of State Court |
| and ) | Conviction: |
| LISA MADIGAN, Attorney General ) | 85 Cr 10757 |
| of the State of Illinois, ) | |
| Respondent(s) ) | |

### MOTION FOR ADMISSIBILITY OF DUPLICATES

NOW COMES Petitioner Drew Terrell, pro se, and respectfully moves this Court pursuant to Rules 201(d) and 1003 of the Federal Rules of Evidence, for the admission of duplicates of his petition for commutation as a public document which this Court may take judicial notice of. In support thereof, the Petitioner states as follow:

1. That his petition for commutation concisely presents many of the facts that are material to his petition for habeas corpus relief filed before this court.

2. That his petition for commutation was drafted by the same attorneys that represented him on the post-conviction petition at issue.

3. That a true and correct duplicate of his petition for commutation filed before Illinois' former Governor Ryan is attached hereto.

4. That said petition for commutation is a true and correct duplicate under the penalty of perjury.

(s) Drew Terrell

PETITION FOR COMMUTATION

I. **REQUEST FOR CLEMENCY**

On July 21, 1986, following a bench trial in the Circuit Court of Cook County, 18-year-old Drew Terrell was convicted of the August 27, 1985 murder and aggravated criminal sexual assault of 15-month-old Laura Hampton. Mr. Terrell waived jury sentencing and on August 28, 1986 the trial court sentenced Mr. Terrell to death for the murder conviction and to a 60-year prison term for the aggravated criminal sexual assault conviction. Throughout these trial proceedings, Mr. Terrell was represented by a private attorney hired by Mr. Terrell's father. *People v. Terrell,* No. 85-CR-10757.

The Office of the State Appellate Defender was appointed to represent Mr. Terrell on appeal. The Illinois Supreme Court affirmed Mr. Terrell's convictions but vacated his sentences and remanded to the circuit court for a new sentencing hearing. *People v. Terrell,* 132 Ill. 2d 178, 547 N.E.2d 145 (1989) *cert. denied* 493 U.S. 959, 110 S.Ct. 2567, 109 L.Ed.2d 749 (1990).

Mr. Terrell was represented by the Cook County Public Defender at his resentencing hearing. On April 7, 1995, a jury found Mr. Terrell eligible for the death penalty and no mitigating circumstances sufficient to preclude imposition of the death penalty. On May 26, 1995, the circuit court sentenced defendant to death. *People v. Terrell,* No. 85-CR-10757.

On appeal, the Illinois Supreme Court affirmed Mr. Terrell's death sentence. *People v. Terrell,* 185 Ill.2d 467, 708 N.E.2d 309 (1998) *cert. denied* 528 U.S. 881, 120 S.Ct. 194, 145 L.Ed.2d 163 (1999).

Mr. Terrell's Petition for Post-Conviction Relief was timely filed in the Circuit Court of Cook County and is pending. Alan Freedman and Carol Heise were appointed to represent Mr. Terrell in post-conviction proceedings and are continuing to investigate his case. One apparant issue is that Mr. Terrell is actually innocent of this offense and that the confession upon which his conviction was based is false. Information gathered so far in that investigation, in the form of affidavits and the report of psychological expert, are attached to this petition.

Mr. Terrell was sentenced to death without benefit of any of the reforms that have been proposed by Governor Ryan's Commission on the Death Penalty and without the benefit of the reforms applicable to capital cases that were implemented by the Illinois Supreme Court effective March 1, 2001. Mr. Terrell was, in short, sentenced to death under a system of capital punishment that Governor Ryan and many others familiar with its operation have aptly described as deeply flawed and in need of repair. Governor Ryan further characterized the

system under which Mr. Terrell was sentenced to death as, "pretty bad . . . whether you were going to live or die . . . was a flip of the coin." John O'Connor, *Death penalty reform faces uncertain future in Illinois*, Chi. Daily L. Bull., April 27, 2002, at 1. Because Governor Ryan could not, "support a system, which, in its administration, has proven to be so fraught with error and has come so close to the ultimate nightmare, the state's taking of innocent life," *id.*, he wisely imposed a moratorium on executions, "[u]ntil I can be sure that everyone sentenced to death in Illinois is truly guilty, until I can be sure with moral certainty that no innocent man or woman is facing lethal injections . . .." *Governor Ryan Declares Moratorium on Executions, Will Appoint Commission to Review Capital Punishment System*, Press Release, January 31, 2000, available at http://ww.state.il.us/gove/press/00/Jan/morat.htm.

It would be unjust to execute Mr. Terrell under a death sentence that was imposed under these conditions. The appropriate action to be taken in Mr. Terrell's case is a commutation of the death sentence. On behalf of Mr. Terrell, we therefore respectfully request Governor Ryan to commute the death sentence imposed upon Mr. Terrell to a sentence other than death.

## II.    **REQUIRED INFORMATION**

The following information regarding Mr. Terrell is provided in compliance with the Illinois Prisoner Review Board's Guidelines for Executive Clemency:

Mr. Terrell's current mailing address is:
Drew Terrell
N63220
Pontiac Correctional Center
P.O. Box 99
Pontiac, IL 61764

Mr. Terrell was convicted of the offense for which clemency is being sought under the name Drew Terrell. Mr. Terrell has never used an alias.

Mr. Terrell's social security number is ▓▓▓▓▓▓▓. Mr. Terrell's state prisoner identification number is N63220. Mr. Terrell has never previously asked for executive clemency for any conviction.

Mr. Terrell's two convictions prior to the conviction giving rise to this petition are as follows:

On February 18, 1985, 17-year-old Drew, Drew's mother, Elizabeth Terrell, and another man were arrested for beating and robbing Rigoberto Gaytan while he was trying to get on a bus. Drew's mother, Elizabeth

Terrell asked Gaytan for money when he boarded a public bus. When Gaytan took out his wallet to give her a dollar, Drew left his bus seat and grabbed the wallet. At the same time, Elizabeth physically attacked Gaytan, scratching him on the face. Gaytan was then pushed by Drew and pulled by a second man waiting outside the bus. As a result, Gaytan was thrown to the ground. Elizabeth, Drew and the other man kicked Gaytan as he lay on the ground and ran off with his wallet.

On September 8, 1984, Drew and another boy were arrested and charged with Robbery. Drew and another boy grabbed a man from behind, struck him and took $35.00 from his rear pocket.

On July 31, 1985, Drew plead guilty to both offenses and was sentenced to 6 months in jail and 2 years probation.

Drew's only other arrest was a battery charge from November 28, 1984. On January 22, 1985, this charge dismissed.

### III. **BIOGRAPHICAL INFORMATION**

Drew Terrell was born to Elizabeth and Drew Burton on April 6, 1967. Drew had one sister who died as an infant. Shortly thereafter, in 1969, Drew's parents separated, although they were not divorced until 1978. Until the divorce, Drew lived with his mother, Elizabeth, and saw his father, Drew, Sr., only on weekends. At the time of the divorce, when Drew was 12-years-old, Drew's father was awarded custody, and Drew lived with his father, his step-mother, Theresa, and two stepsisters for a little over a year. However, due to increasing pressure from his mother, Drew eventually returned to Elizabeth, and was residing with her at the time of this offense.

Elizabeth Terrell's family – including her numerous siblings, aunts, cousins and in-laws – agree that Elizabeth was a nightmare of a mother. Elizabeth apparently developed severe psychiatric problems shortly after her marriage to Drew's father, but received only intermittent treatment. Elizabeth was addicted to drugs and a regular abuser of crack cocaine, PCP, marijuana and amphetamines. As a result of these problems, Elizabeth never maintained a job or a place to live. She and Drew often lived in the streets, shelters, temporary apartments and with various male "friends" of Elizabeth. She stole (from family and strangers) and prostituted herself to support her drug habit. Elizabeth not only used drugs in front of Drew, but, by the time he was 10 years old, she had given him marijuana and "reds."

By all accounts Elizabeth was an extremely violent and volatile person. She frequently observed launching wild verbal and physical attacks on both her family and total strangers. She would even attack grown men whom could clearly do her harm. She was extremely irrational in her attacks. Family members report that she once threw a brick threw her parents window. Drew's cousins recalls a time when Elizabeth set fire to the apartment where she and then seven or eight-year-old Drew were living. Drew was in the apartment, sleeping at the time. Elizabeth had been threatening to set fire to the apartment because she was "envious of her mother's relationship with Drew."

Much of Elizabeth's violence was directed at Drew. She would beat him leaving bruises and welts that were visible for days. She beat him with her fists. On one occasion she was beating 5-year-old Drew so severely in front of her family that they had to pull her away from him.

According to Elizabeth's family, her in-laws and Drew's father, Elizabeth was both extremely domineering toward Drew, but extremely dependent upon him at the same time. All report that Elizabeth encouraged Drew to steal from his family members and give her the money. Elizabeth's brother, Napoleon Wells, recalls that Elizabeth would withhold Drew from school "to punish him and his father," use Drew to steal and beat Drew if did not steal for her. Drew's grandmother reports that "I observed Elizabeth getting into trouble with drug dealers she was hanging out with. Drew Jr. Would try to protect Elizabeth from these individuals, but she would often turn on him even as he tried to help her. The worse Elizabeth treated him, the harder Drew worked to protect her." Elizabeth's sister, Pam, testified that she referred to Elizabeth as "Ma Barker," because Elizabeth encouraged Drew to steal to support her.

Drew's family report that Elizabeth's relationship with Drew was increasingly bizarre. Elizabeth relied on Drew to get her money, protect her and clean her up, but otherwise treated him terribly. It was as if their roles were reversed, and he was the parent and Elizabeth the child. As Drew grew older, Elizabeth started referring Drew as "my man," and behaved as if he were her boyfriend instead of her son.

Throughout all of this Drew remain fiercely loyal to Elizabeth. Although Elizabeth would frequently drop Drew off with relatives and disappear for days, she would always retrieve Drew and he would go back willingly. When Drew went to live with his father after the divorce, Elizabeth called constantly and asked Drew to come back to her. Drew's father states that Elizabeth's primary concern was getting welfare money that she lost when she lost custody of Drew. But within a year, Drew returned to his mother.

-

During the times that Drew was staying with his grandparents or living with his father, Drew went to church and participated in the choir and his school work improved. However, after he returned to Elizabeth, Drew eventually dropped out of school.

A few months before this offense, Drew and Elizabeth were for robbing a man on a bus. According to her relatives, Elizabeth sought money to arrange for bond for herself, left Drew in jail, and told Drew that he should "take the rap" because the court would go easier on him because of his youth. After he got out of jail, Drew returned to Elizabeth.

Family members report that Elizabeth was fiercely jealous of Drew's friends, male or female. This included Marketter Hampton, Laura Hampton's mother, whom Drew invited to stay with he and Elizabeth.

Family members report that although Drew had many problems, he was generally kind to his family and no one ever observed him having any inappropriate or violent behavior around children. In fact, Drew had babysat for his cousins, and there had never been any incident where he attempted to harm them in anyway.

All of the foregoing information comes from the testimony of Drew and Elizabeth's family members from the first and second sentencing hearings, and from the Affidavits and Supplemental Affidavits of Napoleon Wells (Elizabeth's brother), Madelyn Terrell (Drew's grandmother), Larry Wells (Elizabeth's brother), Autoro Terrell (Drew's cousin), Eloise Chambers (Drew's cousin), Lottie Banks (Drew's counsin), Elsie Teague (Drew's great aunt), and Elaine Wadlington (Drew's cousin), attached to this petition.

IV.     **STATEMENT OF THE OFFENSE**

During August of 1985, 15-month-old Laura Hampton and her mother, Markeeter Hampton, were living with Elizabeth and Drew Terrell in a two bedroom apartment. At trial Markeeter Hampton, testified that on the morning of August 27, 1985, Ms. Hampton went to work, leaving Laura with Elizabeth Terrell, who was to baby-sit that day. Ms. Hampton testified that later that morning Drew Terrell telephoned her and told her that Laura had pulled a stereo down on herself and was at St. Anthony's Hospital in a coma. She testified that Laura was subsequently transferred to Cook County Hospital, where she died that afternoon. Ms. Hampton also testified that prior to this offense she had never seen Drew attempt to hurt Laura in any way.

Two Chicago police officers were called to St. Anthony's Hospital to investigate the case as a possible child abuse case. By the time they arrived, Elizabeth had dropped Laura off and returned to her apartment. Drew

had arrived at the hospital by approximately 11:00 am and was waiting.

Both officers testified that, when questioned in the hospital emergency room, Drew stated that he was alone with Laura and believed that her injuries were caused by a stereo falling on her. However, after speaking with a physician at the hospital concerning Laura's injuries, the officers determined Laura suffered a laceration from her vagina to her anus that was not consistent with a stereo falling on her. Thus, at 12:45 pm the detectives took Drew to the police station for questioning.

They commenced interrogating Drew by 3:00 pm. Drew again said that he was alone with Laura, heard a noise and found Laura injured. Drew said that his mother then came home and took Laura to the hospital. Several hours later, Drew was again interviewed, this time by an Assistant State's Attorney along with the police. This time Drew stated that he was left alone with Laura Hampton at approximately 10 a.m. on August 27, 1985, when his mother went to the currency exchange to cash a check. He stated that he carried Laura into the bedroom and laid her on the bed next to him. When the baby woke up and began to cry, Drew said that he struck her on the back with his open hand. Laura continued to cry, so Drew changed her diaper. Laura continued to cry after her diaper was changed, so Drew said he struck her again on the face and several times on her stomach. Drew said that he then changed her diaper again, and inserted a Q-tip and then his finger into the baby's vagina and started "handling her." Drew said that he inserted his finger a couple of inches, "up to the bone" and stated that he was "looking for a pain response." Drew said this went on for about a minute or two, and then his mother came home. His mother took the baby to the hospital, while Drew went out to find a phone to call Markeeter. At 8:50 pm Drew's statement to this effect was reduced to writing and he signed it. The interrogation itself was not recorded.

At approximately 6:00 pm, Drews mother, Elizabeth, two of his aunts, his niece and his stepmother all arrived at the police station and asked to speak with Drew. They were told they could not see Drew until the police were done talking with Drew. After Drew signed his statement, he was finally permitted to see his mother.

There was no physical or other evidence linking Drew to this offense.

A medical examiner testified that Laura suffered internal injuries that caused her death. He also testified that the lacerations to Laura's genital area were consistent with a finger or Q-tip being inserted into the vagina.

At the trial, Drew testified that he was left alone with Laura at approximately 9:30 a.m. on August 27, 1985, when his mother went to the currency exchange. He stated that he took the baby to the hospital at

approximately 11 a.m. and told the police that it appeared as though a stereo had fallen on the victim. On cross-examination, Drew denied that he watched Laura while his mother went to the currency exchange. He testified that he "stepped out" for approximately 40 minutes while his mother was gone and left Laura alone in the apartment. Drew testified taht when he returned to the apartment, it appeared as though a stereo had fallen on Laura.

Drew denied that he had beaten or otherwise hurt Laura. He conceded that he had given the statement to the police, but claimed that he gave a statement to the assistant State's Attorney because a police officer had confronted him and asked him whether he knew what happened to people who did not cooperate with police. Earlier, at the suppression hearing, Drew had testified that one of the detectives had grabbed his collar, pushed him, and told him that he was withholding information. He testified that when he asked the State's attorney "where's my lawyer" the State's attorney did not answer. Drew testified that he had repeatedly asked to be allowed to call his family, but was told he could not do so until he went to lock-up. Drew said that he was given something to drink at about 6:00 pm and was given food at 9:00 pm.

The trial court found the defendant guilty of murder and aggravated criminal sexual assault and, after a sentencing hearing before the judge, sentenced Drew to death.

Drew's father had mortgaged his house to retain the services of a private attorney to represent Drew during this trial. On appeal, Drew was represented by the State Appellate Defender. The Illinois Supreme Court vacated Drew's death sentence and the case was remanded for a new sentencing.

During the resentencing, Drew was represented by the Cook County Public Defender's Office. This time, Drew's sentencing took place before a jury. Two things of note took place at the resentencing, relative to the offense.

First, Drew's new lawyers wanted to argue that Drew had not committed the offense, and attempted to introduce evidence to support this theory. In fact, it was Drew's new defense team's theory that it was more likely that Drew's mother, Elizabeth, committed the offense. However, the trial court refused to permit the defense from arguing or presenting any evidence of Drew's innocence, holding that the issue of Drew's guilt was already determined at the first trial. This decision was upheld by the Illinois Supreme Court on appeal.

Second, the State changed it's theory, somewhat, as to how Laura's injuries occurred. At the original bench trial, the trial court found that Drew inserted his fingers and a Q-tip into Laura Hampton's

vagina and anus. This finding was based upon Drew's statement to the police, and supposedly supported by the autopsy findings. However, at the resentencing, because the original pathologist who examined Laura was unavailable, the State relied upon the testimony of a different pathologist, who after examining Laura's medical and autopsy records, testified that that it was possible that Laura's injuries to her vagina and rectum could have been caused by the insertion of either adult fingers, an adult penis or a foreign object. She also testified that the patterned bruises on Laura's face could have been caused by being hit with the back of a hair brush. Thus, the asserted that Drew may have used a hair brush, tooth brush, metal rod or his penis to penetrate the victim, and put a hair brush, tooth brush and metal rod into evidence. These items were collected from Elizabeth and Drew's apartment just after the offense and Drew's underwear and clothes were collected at the time of his arrest. All of these items were submitted to the state laboratory for testing and none produced any evidence linking Drew to this crime. On appeal, Drew's attorneys claimed that the State should not have been able to change its theory of the crime like this, particularly while Drew was being precluded from challenging the State's case against him for guilt. However, the Illinois Supreme Court determined that the issue was waived because Drew's trial counsel had not raised it during the trial.

_____The foregoing information is from the testimony from the suppression hearing prior to Drew's first trial, the testimony from the trial itself and the resentencing, all of which were made part of the record on appeal.

It is still Drew Terrell's position that he did not commit this offense and that his confession is false. Since his appeal, Drew's post-conviction counsel have been investigating this case. So far they have learned:

- One of Drew's cousins, Eloise Chambers, observed Marketta [sic] Hampton coming to the county jail to see Drew prior to his trial and yelling at him for "admitting to a crime she knew Elizabeth committed." Affidavit of Eloise Chambers, at para. 13.

- Elizabeth's brother, Napoleon Wells, has stated in an affidavit that Elizabeth told him that "she told Drew to confess to the crime to cover for her because he would get less time than she would be better able to handle a prison sentence." Supplemental Affidavit of Napoleon Wells, para. 4; Additional Supplemental Affidavit of Napoleon Wells, para. 2.

In addition, during these pending post-conviction proceedings, Drew's post-conviction counsel have sought expert assistance in assessing the reliability of Drew's confession. Dr. I. Bruce Frumkin, a Clincal Psychologist and Diplomate in Forensic Psychology conducted a clinical evaluation of Drew, administered psychological and

intelligence tests and reviewed all available data concerning the offense and Drew's statement to the police. Dr. Frumkin made the following findings based on his evaluation:

- Intelligence tests show that Drew is of low average to borderline intelligence.

- Drew advised that he ultimately provided three different "versions" of what transpired at the time of Laura's death. Each time he provided a written statement that was not consistent with the facts the police believed to be true, they tore it up and told Drew to "tell the truth." Drew provided his version to a stenographer only after the police had approved of what he was going to say.

- The transcribed statement used against Drew at trial is internally inconsistent and inconsistent with the known facts of the case.

- The police used leading and/or suggestive questioning throughout the interview.

- The speech patterns in the transcribed statements were very inconsistent with the manner in which Drew currently speaks.

- Drew's past history and current clinical presentation is consistent with someone who has "learned helplessness." Dr. Frumkin explains, "Drew] has learned throughout his life experiences (mainly the beatings he received) that it is futile to initiate any behavior to reverse aversive circumstances. Whatever actions he takes, it makes no difference in the outcome. Thus, he responds to difficult and anxiety-provoking situations by 'freezing' and becoming panic stricken. He shows poor judgment and problem solving skills and will try to do anything to get out of an unbearable situation. Thus, it is entirely conceivable that he would confess to something he did not do to death with the dilemma of the police threatening to arrest his mother."

- Dr. Frumkin administered a Gudjonsson Suggestibility Scale 1 (GSS 1) test to Drew. Drew's total score is in the 90% range – that is, Drew is more suggestible than 90% of the other individuals tested. Dr. Frumkin noted that, when given negative feedback to a response, Drew would "shift" his answers to please the questioner. Research on the GSS has shown that people with high scores, such as Drew, are more susceptible to giving erroneous accounts of events when subjected to police interrogation.

- Drew's history indicates that Drew has sought to protect his mother from being arrested on other occasions.

Based on his evaluation and these findings, Dr. Frumkin ultimately concluded that:
[Drew] is . . . a highly suggestible individual who will passively shift his responses or answers when provided with negative feedback. From his history, it appears he will engage in a variety of behaviors to protect his mother. In light of the above and various inconsistencies found within his confession, a reasonable probability exists to challenge the veracity of his confession.

Psychological Evaluation of Drew Terrell by Dr. Bruce Frumkin, dated May 30, 2000, at pages 5-6 (attached)

V. **REASONS FOR GRANTING CLEMENCY**

Drew Terrell is seeking a commutation of his death sentence. That sentence was imposed under a system that has been aptly characterized as "broken" and "fundamentally flawed." A commission of prominent citizens appointed by Governor Ryan has issued a report detailing 85 reforms that the General Assembly should implement if there is to be hope of a fair and reliable system of capital punishment in this State. Mr. Terrell was sentenced to death without the benefit of any of these reforms.

The Illinois Supreme Court promulgated amendments to its Rules applicable to capital cases effective March 1, 2001. As the Committee Comments to those new rules indicate, their purpose is to "enhance the truth-seeking process" and to "ensure that capital defendants receive fair and impartial trials and to minimize the occurrence of error in capital trials." (Rule 416, Committee Comments). Yet, Mr. Terrell did not have the benefit of those amendments because his death sentence was imposed prior to their effective date.[1]

It would be unjust, in the face of the record of capital punishment in Illinois and the widespread reforms that the Ryan Commission views as necessary to the creation of a just and reliable system, to allow the execution of any death sentence that was imposed under the prior flawed regime.

Based on the specific recommendations set forth by the Ryan Commission, there are at least four reasons why Mr. Terrell's death sentence should be commuted: (1) there is a substantial probability that Drew Terrell is innocent of the offense for which he was sentenced to death; (2) Mr. Terrell's conviction rests exclusively on a confession that was obtained from him when he was 18-years-old, after an interrogation in police custody, that was not recorded on tape or video tape, and that Mr. Terrell has recanted at the time of his trial; (3) the prosecutor's decision to seek the death penalty was not made under the guidance of state-wide protocols; and (4) the decision to seek the death penalty in Mr. Terrell's case was not subjected to proportionality review.

1. **There is a substantial probability that Drew Terrell is innocent of this offense.**

As with many of the individuals on Illinois's death row that where later exonerated, in Drew's case, the State appears to have seized on the easiest way to solve the case, with the Assistant State's Attorney obtaining a

---

[1] The Supreme Court has ruled that its new rules will not be applied retroactively to those already convicted and sentenced to death. (People v. Hickey, 2001 Ill. LEXIS 1080).

confession from 18-year-old Drew within 12 hours of Laura's Hampton's arrival at the hospital. Having obtained a confession, the police failed to pursue the matter any further, even though it should have become apparent that: 1) Drew's statements about his actions did not conform to the later medical and autopsy findings; 2) Drew was easily manipulated, given his youth, lack of education and long history of protecting his mother; 3) there was no physical evidence linking Drew to this offense. We submit that the following facts strongly suggest that Drew's confession was false, and that Drew is innocent of this offense:

- It appears that there were only two people with Laura on the morning of her death: Drew Terrell, and his mother, Elizabeth.
- Laura was left in Elizabeth's care.
- Elizabeth has a history of extremely violent and erratic behavior.
- Elizabeth has a history of exploiting Drew and using him to cover her own criminal behavior.
- Drew Terrell has no history of violence toward children.
- Laura's mother testified that Drew had never shown any indication that he could hurt Laura.
- Upon discovering Laura's injuries, Drew called Laura's mother, Markeeta, and told her to come to the hospital.
- Drew went to the hospital where Laura was taken and remained there; Elizabeth returned to her apartment right away.
- The only evidence that Drew committed this offense was Drew's own statement to the police. Although physical evidence was collected from the scene and Drew and submitted for testing, none of this could be used to link Drew to this crime.
- The police admit that Drew gave at least 2 statements in which he did not admit to hurting Laura.
- Drew was an 18-years-old high school drop out at the time of the interrogation. Testing shows he is of low-average to borderline intelligence.
- All of Drew's statements – the first two, the one inculpating himself, and his later recant during the trial – exculpate Elizabeth.
- Drew is fiercely loyal to Elizabeth and has a long history of trying to protect her.
- Psychological testing indicates that Drew is highly suggestible and likely to succumb to coercive tactics employed by the police.
- Drew testified under oath that the statement he gave the police indicating that he hurt Laura was false, and given only because the coercive tactics employed by the Chicago police.

- Although he was only 18-years old, he was denied access to his family during his interrogation.

- Drew's description of how he harmed Laura are consistent with what the police knew about Laura's injuries at the time of the interrogation; Drew's description of how he harmed Laura are inconsistent with the medical evidence concerning the nature of Laura's actual injuries that was available after the interrogation. This inconsistency was not apparent during the initial bench trial, as the pathologist's testimony did not highlight this fact. However, at the subsequent resentencing before a jury, the State had to rely upon a new pathologist, and was permitted to add evidence to its case, to support the "new" medical evidence. The defense, on the other hand, was not permitted to introduce any evidence, even through cross-examination, to demonstrate that Drew did not commit this offense. This type of inconsistency should call into question the reliability of the Drew's "confession."

- Drew's interrogation was not recorded in any way.

- Elizabeth's Terrell's brother has reported that Elizabeth admitted to him that she asked Drew to take the rap for her in this case.

- Drew's cousin, Eloise Chambers, reports that she overheard Laura Hamptons mother accusing Drew of covering for his mother in confessing to this offense.

At a minimum, the foregoing casts consider doubt as to Drew Terrell's guilt in this case, and the reliability of his confession. Drew Terrell would not be the first person to confess to a murder he did not commit. The Ryan Commission noted several examples of cases in involving false confessions in Illinois. See Ryan Commission Report on Capital Punishment, Chapt. 2, page 24-25 (describing cases of Gary Gauger and Corethiean Bell); Ryan Commission Recommendations, Chapt. 1, page 9 (describing the case of Ronald Jones). In addition, according to the information gathered by the Innocence Project of the Benjamin N. Cardozo School of Law, 15 of the first 70 DNA exonerations involved false confessions. See www.innocenceproject.org/causes/index.php. Given the paucity of any other evidence suggesting that Drew Terrell killed Laura Hampton, the likelihood that Drew's confession may be false should provide ample cause for clemency in this case.

2. **Drew's "confession" was produced by an interrogation that was not recorded.**

The Ryan Commission has recommended that in homicide cases, custodial interrogations occurring at police facilities should be video taped, or, when video taping in impractical, audio taped. (Ryan Commission Recommendations 4 and 6). In addition, police officers should carry tape recorders and out of station interrogations should be audio taped. (Ryan Commission Recomendation 6). The Commission was clear that it was seeking to

have *the entire interrogation process* recorded, not just the part where the suspect confesses. (Ryan Commission Recommendation 4 and 5).

These procedures were recommended based on the Commission's recognition of other Illinois cases "in which it has been claimed that suspects confessed to a crime, and it was later established that the suspect was innocent," (Ryan Commission on Capital Punishment Report, Chapter 2, page 24) and the growing body of academic literature documenting and discussing the phenomenon of "false confessions." (Ryan Commission on Capital Punishment Report, Chapt. 2, page 24-27)  The purpose of recording confessions is to enable the defense counsel, the prosecution, the trial court and, ultimately, the trier of fact, to reach a well informed determination as to reliability of any purported statements by the defendant.

In this case, Drew's conviction rests exclusively upon his own confession.  Since his suppression hearing before his first trial, Drew has claimed that this confession is false, and the product of the coercive tactics used by the police.  As there is neither an audio tape nor a video tape of the police interrogation of Drew, it is impossible to say with any reasonable degree of certainty that the confession it produced was reliable.  Under these circumstances, the failure to provide the recommended procedural protections should warrant clemency in this case.

**3. The prosecutor's decision to seek a death sentence was made without the benefit of uniform protocols to guide prosecutorial discretion in such decision making and without the benefit of mandatory review of the decision by a state-wide Review Committee.**

Currently, there are no standards or criteria for the prosecution to follow or consider in determining whether to seek the death penalty.  As a result, the process of determining whether to seek the death penalty differs in each of Illinois' 102 counties. Accordingly, the Ryan Commission unanimously recommended that written state-wide protocols be adopted. (Ryan Commission Recommendations 29 and 30)  As Drew Terrell did not receive the benefit of this reform, this forms an additional basis for granting clemency in this case.

**4. On direct appeal, the Illinois Supreme Court did not consider whether Drew Terrell's sentence was disproportionate to other sentences or was the result of arbitrary factors and did not independently weigh the aggravations and mitigation.**

A majority of the Ryan Commission members recommended that the Illinois Supreme Court conduct proportionality review of death sentences on direct review in order to ensure that the death penalty is being applied in an appropriate and even-handed manner state-wide. (Ryan Commission Recommendation 70). The Court's failure to conduct a proportionality review in Drew Terrell's case is an additional reason to grant clemency in this

case.

Under the foregoing circumstances, it is not possible to say that proceedings in this case produced a fair and reliable determination that the death sentence is appropriate in this case.

**RECOMMENDATION**

For the foregoing reasons, we respectfully request Governor Ryan to commute the sentence of death imposed upon Drew Terrell on May 25, 1995 in the case of *People v. Terrell,* No. 85 CR 10757 (Circuit Court fo Cook County) to an appropriate sentence of imprisonment.

Respectfully submitted,<br>
DREW TERRELL<br>
<br>
By: _____<br>
One of his attorneys

**ALAN M. FREEDMAN**
**CAROL HEISE**
**MIDWEST CENTER FOR JUSTICE**
22 West Monroe, Suite 1206
Chicago, Illinois 60603
(312)726-1731
(312)726-1736 (fax)

**REPRESENTATIVES FOR PETITIONER**